McDonald, J.
|gIn this appeal, a dirt pit owner challenges a judgment finding the trial court had subject matter jurisdiction over an agency’s enforcement action against the dirt pit owner. We affirm the judgment.
FACTUAL AND PROCEDURAL BACKGROUND
The Comite Dirt Pit, Inc. (CDP) is a family-owned business located in East Baton Rouge Parish on the left descending bank of the Comite River. Since approximately 1984, CDP has surface mined sandy material such as river silt to sell to contractors for building foundations. In February 2009, Chris Davis and Matthew Weigel, Louisiana Department of Wildlife and Fisheries (LDWF) biologists, visited CDP’s site as part of their duties involving the permitting of activities along certain scenic Louisiana rivers. They determined that CDP was conducting its surface mining activities without a permit at a location where the Comite River was designated as a “natural and scenic river” under the Louisiana Scenic Rivers Act (LSRA), LSA-R.S. 56:1840, et seq.
In May 2009, LDWF Secretary Robert J. Barham issued a Cease and desist order to CDP, under the LSRA’s enforcement provisions, ordering CDP to immediately cease all mining activities and removal of trees along a designated portion of the Comite River, as identified on attached maps. The cease and desist order stated that the LDWF had determined CDP violated the LSRA, and rules promulgated under the act, by mining immediately adjacent to a natural and scenic river without a permit and by commercially removing trees within 100 feet of the river. The cease and desist order further ordered CDP to contact the LDWF Scenic Rivers Coordinator within five days and to submit a restoration plan for the river bank within 90 days. The cease and desist order explained that noncompliance with its terms was punishable by civil and criminal penalties, possible imprisonment, and further enforcement action. The record indicates that CDP received but did not respond to the cease and desist order.
In June 2009, Messrs. Davis and Weigel returned to CDP and saw that CDP continued to mine and that its mining activity had extended further down and caused breaching of the Comite River bank, in violation of the cease and desist order. Within a few days, the LDWF filed a petition for a temporary restraining order (TRO), preliminary |sand permanent injunctions, and declaratory judgment against CDP.
On June 19, 2009, the trial court signed a TRO, restraining' CDP from: (1) any mining related activity (a) between the Comite River’s ordinary low water mark and the access road running generally parallel to the river bank, and (b) within 100 feet of the ordinary low water mark in areas without an access road; and (2) any tree removal/cutting/harm within' 100 feet of the Comite River’s low water mark. The TRO also set a hearing on the preliminary injunction for July 1, 2009. On that day, *876 CDP filed an exception pleading prematurity based on the LDWF’s failure to hold an adjudicatory hearing, and also filed an answer, a reconventional demand, and a motion to dissolve the TRO. In lieu of the scheduled hearing, the parties agreed on the record in open court to continue the TRO indefinitely. Later, on October 5, 2009, the trial court signed an order memorializing the parties’ agreement and repeating the TRO’s prohibitory terms applicable to CDP’s mining activity (2009 Consent Order).
Over the next five months, discovery was conducted and the LDWF responded to CDP’s pleadings. Then, in early March 2010, Messrs. Davis and Weigel returned to CDP and saw evidence of recent mining activity within areas proscribed by the continuing TRO. The LDWF promptly filed a rule for contempt against CDP for violating the 2009 Consent Order. The trial court set the rule for hearing, but, on June 29, 2010, in lieu of the hearing, the parties again agreed to continue the TRO indefinitely. Additionally, CDP agreed to restore certain areas along the Comite River bank. On October 13, 2010, the trial court signed an order memorializing the parties’ agreement, repeating the TRO’s prohibitory terms, and ordering CDP to comply with an attached Initial Restoration Plan, which set forth the terms of CDP’s restoration obligations (2010 Consent Order). CDP’s president, Shane Rush, and all attorneys of record signed the 2010 Consent Order. The Initial Restoration Plan required CDP to complete restoration of defined areas in phases, with deadlines occurring in August 2010, October 2010, and April 2011. Notably, however, in the Initial Restoration Plan, CDP disclosed that the U.S. Army Corps of Engineers (the Corps) had informed it that the Corps had plans to expropriate all of CDP’s property adjacent to the Comite River. Thus, the Initial Restoration Plan contained an express provision that CDP and the LDWF would meet |4with the Corps before the expropriation to determine what modifications to the plan would be needed.
Messrs. Davis and Weigel visited CDP in November 2010 and saw no signs of restoration. In December 2010, the LDWF sent Mr. Rush a letter stating that CDP was being placed in default for noncompliance with the 2010 Consent Order and requesting payment of stipulated damages, as provided in the Initial Restoration Plan. In March 2011, the LDWF filed a motion to enforce the 2010 Consent Order, and in May 2011, after observing signs of recent excavation at CDP, filed a second rule for contempt against CDP. The record does not show the disposition of the rule.
In July 2013, after retaining new counsel, CDP filed a motion to set aside the 2010 Consent Order based on mistake of fact. CDP essentially alleged that the only reason it signed the 2010 Consent Order was because it believed the Corps was going to expropriate its property for construction of the Comite River Diversion Canal, making it unlikely that restoration would be necessary. According to CDP, the LDWF was part of numerous discussions with CDP, the Corps, and the Amite River Basin District Commission regarding the expropriation of CDP’s property, such that any restoration of the property would be mooted. CDP alleged that it learned in January 2013 that the expropriation was not going to happen and that it would not have signed the 2010 Consent Order had it known there would be no expropriation. Before CDP’s motion was heard, it filed an exception of lack of subject matter jurisdiction, failure to exhaust administrative remedies, and action in nullity. The LDF opposed the exception.
In January 2014, the trial court stayed the matter to await the outcome of a suit *877 CDP filed against LDWF Secretary Bar-ham in federal court. Ultimately, the federal suit was dismissed, and the trial court lifted the state court stay and held a hearing on CDP’s motion and exception, and LDWF’s motion to enforce the 2010 Consent Order. On February 24, 2016, the trial court signed a judgment: (1) denying CDP’s exception of lack of subject matter jurisdiction, failure to exhaust administrative remedies, and action in nullity; (2) denying CDP’s motion to set aside the 2010 Consent Order based on mistake of fact; (3) granting the LDWF’s motion to enforce the 2010 Consent Order; and (4) ordering CDP to restore the subject property as provided in the Initial [ ^Restoration Plan, subject to a modification of dates therein.
CDP appeals from the adverse judgment, contending the trial court erred in concluding it had subject matter jurisdiction to decide this matter without first requiring the LDWF to exhaust administrative proceedings. Alternatively, CDP argues the trial court erred in refusing to address whether the LSRA applies to CDP’s property. CDP does not appeal the judgment insofar as it denied CDP’s motion to set aside the 2010 Consent Order, granted the LDWF’s motion to enforce the 2010 consent Order, and ordered CDP to restore the subject property.
DISCUSSION
CDP first argues the LDWF was required to exhaust administrative remedies before bringing this action in district court. We begin with a background of applicable law. In 1970, the Louisiana legislature enacted the LSRA, currently LSA-R.S. 56:1840-1856, which established the Louisiana Natural and Scenic Rivers System (System). LSA-R.S. 56:1840 and 1841(A). The LSRA’s purposes include the preservation and protection of the wilderness qualities, scenic beauties, and ecological regime of certain free-flowing Louisiana rivers, streams, and bayous. LSA-R.S. 56:1841. Since the LSRA’s enactment, the Comite River, from the Wilson-Clinton Highway in East Feliciana Parish to the entrance of White Bayou in East Baton Rouge Parish, has been designated as a natural and scenic river. Former LSA-R.S. 56:1846(8) (as originally enacted by 1970 La. Acts No. 398, § 1). CDP does not dispute that its property lies within this designated area.
The Secretary of the LDWF is the administrator of the System. LSA-R.S. 56:1842(2) and 1843(A). He has the authority, among other things, to adopt rules necessary to implement the LSRA, including the regulation of those activities that may directly and significantly degrade the ecological integrity of a natural and scenic river, such as mining for natural resources. LSA-R.S. 56:1843(B)(1) and 1850(A)(4). No person shall engage in activity governed by the LSRA, or rules thereunder, unless he first obtains a permit from the LDWF Secretary. LSA-R.S. 56:1849(A); Rapides Par. Waterworks Dist. No. 3 v. Broussard, 95-361 (La.App. 3 Cir. 10/18/95), 663 So.2d 475, 479, writ denied, 95-2777 (La. 1/26/96), 666 So.2d 679.
LUnder LSA-R.S. 56:1851, the LDWF Secretary has multiple powers to address violations of the LSRA. Under Section 1851(A), he has the authority to impose civil penalties for violation of the LSRA, or rules adopted thereunder, and to suspend, annul, withdraw, or revoke LSRA permits. And, under Section 1851(B), the LDWF Secretary may issue cease and desist orders, compliance orders, and obtain injunctions or other appropriate relief, upon determining that a violation of the LSRA, or rules adopted thereunder, or agreements made pursuant to the LSRA, has occurred, is occurring, or is about to occur. Section *878 1851(A)(2) requires that, before taking either action set forth in Section 1851(A)(1), the LDWF Secretary must hold an adjudicatory hearing in accordance with the Louisiana Administrative Procedure Act (LAPA), LSA-R.S. 49:950 et seq., and issue a ruling based on that hearing. On the other hand, Section 1851(B) does not require an adjudicatory hearing before the LDWF Secretary takes any action authorized under its provisions. Thus, under the statute alone, the LDWF was not required to hold an adjudicatory hearing before issuing a cease and desist order to CDP or before obtaining injunctive relief against it.
Our inquiry does not end there, however, because in addition to the LSRA’s statutory provisions, the LDWF has also adopted rules that dictate its actions under the LSRA. Under La. Admin. Code, tit. 76, pt. IX, § 119, the LDWF Secretary’s powers to address LSRA violations are the same as those set forth in LSA-R.S. 56:1851. Section 119 does not reference an adjudicatory hearing similar to that required by LSA-R.S. 56:1851(A), but rather states that, for any violation, the LDWF Secretary’s enforcement action must be “in accordance with [the LAPA].” But, the phrase “in accordance with the LAPA” does not mean the LDWF Secretary had to conduct an adjudicatory hearing before issuing the cease and desist order to CDP or before obtaining injunctive relief against it. Under the LAPA, adjudicatory hearings are required in specifically defined situations where the agency process is for formulation of a statutorily-defined “decision” or “order.” See LSA-R.S. 49:951(1) and (3); see also Bd. of Comm’rs. of Southeast La. Flood Prot. Auth-East ex rel. Orleans Levee Dist. v. La. Dep’t. of Natural Resources, 11-0262 (La.App. 1 Cir. 9/29/11), 78 So.3d 750, 752. A “decision” or “order” is a final agency disposition, in any matter other than rulemaking, required by constitution or ^statute to be made only after notice and hearing. LSA-R.S. 49:951(3). Although CDP sets forth numerous definitions and provisions of the LAPA in its brief, there has been no showing that the constitution or a statute required that the LDWF hold a hearing before issuing a cease and desist order, before seeking injunctive relief, or before it sought to enforce the 2010 Consent Order to which the CDP voluntarily agreed. CDP’s contrary argument is without merit.
CDP next argues that the trial court should have determined the LSRA does not apply to its property, and CDP “never had its day in court” to prove such. Specifically, CDP argues it was not allowed to offer evidence that its property is private and that the section of the Comite River running through its property is a non-navigable stream. Based on CPD’s execution of the 2010 Consent Order and the Initial Restoration Plan, we find that CDP cannot now dispute the applicability of the LSRA to its property.
First, we note that CDP had several opportunities to contest the LDWF’s cease and desist order and its subsequent enforcement action in court. Initially, the May 2009 cease and desist order instructed'CDF to contact the LDWF Scenic Rivers Coordinator within five days of receipt of the order and warned that noncompliance was punishable by further enforcement action. However, CDP did not respond to the cease and desist order. When the LDWF later obtained the TRO, the trial court set a hearing on the preliminary injunction at which CDP could have had its day in court. Rather, in lieu of the hearing, CDP agreed to the 2009 Consent Order, which continued the TRO indefinitely and prohibited CDP from mining along the Comite River. When the LDWF later filed a hule for contempt against CDP for violating the 2009 Consent Order, the trial court *879 set a hearing at which CDP could have again presented its case. Rather, in lieu of the contempt hearing, CDP again agreed to continue the TRO indefinitely by signing the 2010 Consent Order. And, even further, in the 2010 Consent Order, CDP agreed to comply with all terms of the Initial Restoration Plan, a contractual agreement binding itself to restore its property along the Comite River within specific deadlines. When CDP failed to comply with the Initial Restoration Plan, the LDWF sent it a default letter, filed a motion to enforce the 2010 Consent Order, and a second rule for contempt. In response to all of the LDWF’s above actions, CDP could have had its day t pin court to contest the LSRA’s applicability to its property. Instead, CDP chose to contractually bind itself to extensive restoration obligations of its property.
A consent judgment constitutes a compromise, which is a contract whereby the parties, through concession by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship, LSA-C.C. art. 3071; Leonard v. Reeves, 11-1009 (La.App. 1 Cir. 1/12/12), 82 So.3d 1250, 1261. A compromise is the law between the parties and must be interpreted according to the parties’ intent. LSA-C.C. art. 2045; Chauvin v. Exxon Mobil Corp., 14-0808 (La. 12/9/14), 158 So.3d 761, 766. The general rules of contract interpretation apply in construing a compromise. Id. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. LSA-C.C. art. 2046; Horrigan v. Horrigan, 10-1377 (La. App. 1 Cir. 6/14/11), 70 So.3d 111, 114, writ denied, 11-1596 (La. 10/7/11), 71 So.3d 325.
Here, CDP signed the 2010 Consent Order, which plainly stated that CDP would “comply with all terms and provisions of the Initial Restoration Plan, attached hereto as Exhibit A and made a part of this Order.” In turn, in th¿ Initial Restoration Plan, CDP acknowledged that its site was located on the Comite River’s left descending bank; that its site contained “several dredged pits, roads and other disturbed excavation areas within the immediate floodplain of the Comite River”; and that “[significant alterations to the natural contours of the bank of the Comite River [were] evident and extensive and [required] immediate attention if further damage to the Comite River floodplain ... [was] to be avoided.” CDP agreed to restore three defined restoration areas along the Comite River, by filling, cqntouring, and planting specific vegetation within specified deadlines. Further, CDP agreed to implement appropriate erosion and sediment control measures; to bi-annually control exotic/invasive species growth; to provide monthly reports to the LDWF until contour restoration was complete; to conduct annual vegetative monitoring of each area for five years and to report to the LDWF; and, to notify LDWF of any contour reestablishment or planting, failure. Lastly, CDP agreed to pay stipulated damages should it fail to complete any of the work by the Initial Restoration Plan’s deadlines.
|flCDP’s agreement to comply with the Initial Restoration Plan is clearly and explicitly set forth in the 2010 Consent Order. Further, CDP.’s obligations under the Initial Restoration Plan are also clearly and explicitly set forth and are plainly premised on CDP’s acknowledgment that its property along the Comite River was controlled by the LSRA. The parties’ agreement became the law between them, and CDP cannot now resurrect the defense of the LSRA’s inapplicability after binding itself to the 2010 Consent Order and Initial Restoration Plan. LSA-C.C. art. 2045; see City of Kenner v. Jumonville, 97-125 (La. App. 5 Cir. 8/27/97), 701 So.2d 223, 229, *880 writ denied, 97-2890 (La. 1/30/98), 709 So.2d 718. Further, although CPD asserted below that it would not have signed the 2010 Consent Order had it known the expropriation of its property would not take place, the Initial Restoration Plan does not provide for this alleged resolutory condition. See LSA-C.C. art. 1767. Rather, its explicit terms merely state that the Corps had contacted CDP regarding the Corps’ “desire” to expropriate CDP’s property and that CDP and the LDWF agreed “to meet with the Corps prior to expropriation to determine modifications required to be made to [the Plan].” Thus, the 2010 Consent Order and Initial Restoration Plan make no provision for the nonoccurrence of the expropriation. And, although we note that a consent order may be set aside for a vice of consent, such as error (see LSA-C.C. art. 1948 et seq.), the trial court judgment denied CDP’s motion to set aside the 2010 Consent Order based on mistake of fact. CDP did not raise that issue on appeal and we will not address it.
CONCLUSION
For reasons expressed in this opinion, we affirm the February 24, 2016 judgment (1) denying Comite Dirt Pit, Inc.’s exception of lack of subject matter jurisdiction, failure to exhaust administrative remedies, and action in nullity; (2) denying Comite Dirt Pit, Inc.’s motion to set aside the 2010 Consent Order based on mistake of fact; (3) granting the Louisiana Department of Wildlife and Fisheries’ motion to enforce the 2010 Consent Order; and (4) ordering Comite Dirt Pit, Inc. to restore the subject property as provided in the Initial Restoration Plan, subject to a modification of dates therein. Costs of the appeal are assessed to Comite Dirt Pit, Inc.
AFFIRMED.